William CALDWELL, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 17627.

United States Court of Appeals
Eighth Circuit.

Nov. 27, 1964.

Rehearing Denied Dec. 10, 1964.

**386**

Samuel H. Liberman, II, St. Louis, Mo. (appointed by Court), for appellant.

Stephen H. Gilmore, Asst. U. S. Atty., St. Louis, Mo., Richard D. FitzGibbon, Jr., U. S. Atty., on brief, for appellee.

Before VOGEL, VAN OOSTERHOUT and MEHAFFY, Circuit Judges.

MEHAFFY, Circuit Judge.

The defendant was convicted by a jury of robbing a federally insured bank in violation of 18 U.S.C.A. § 2113.

On the morning of December 11, 1963, at approximately 10:30 a. m., a man later identified as the defendant entered the Lindell Trust Company in St. Louis, Missouri, and approached teller Barbara Ann Hallam. Carrying a black shaving case and a paper wrapped package, he placed these articles under the teller's window and told Hallam, "This is a bomb, stand very still, sound no alarms or you will be injured. Give me your tens, fives and twenties." After defendant repeated his demand, Hallam put $1,500.00 in five, ten and twenty dollar bills in the black case. The defendant ordered the teller to stand still for two minutes and he hurriedly walked out of the bank. The teller was unable to sound the alarm but shouted, "Help, robber," and pushed the "bomb" from the counter to the floor on the other side.

At this same time, bank guard Groover entered the building, noticed the robber who was leaving in a hurry, and after hearing the teller's plea for help, gave chase along with Vice President Greenleaf. Both pursued the robber as he ran across the street and through a parking lot where attendant Atkins also observed him fleeing. The robber then turned south through an alley and entered an unoccupied, parked automobile. He drove away as the bank guard fired four pistol shots in an attempt to prevent his escape. The guard and Greenleaf commandeered an automobile to continue pursuit and found the robber's car abandoned three blocks away. Subsequent investigation revealed the license on the abandoned car had been issued to the defendant.

Teller Hallam positively identified the defendant as the man who robbed her from two sets of pictures furnished by the police. She also identified defendant in a police "lineup" on the evening of the holdup. Groover and Atkins were also positive in their identification of the defendant, but Greenleaf, while able to describe the robber's general appearance, was not positive in his identification as he had not seen the robber's face.

Shortly after 3:00 p. m. on the day of the robbery, the defendant was arrested by St. Louis city police officers as he alighted from a taxicab near his home. He was taken to the Fifth District Police Station for booking where he was questioned and searched. He had on his person one twenty dollar bill, one five dollar bill, nineteen ten dollar bills, five one

dollar bills and some change. He was then taken to Central Headquarters, arriving there around 5:30 p. m. The arrest was made some five or six miles from the Fifth District Station and while en route the police car had a flat tire which, coupled with snow covered streets, accounted for the delay in transporting defendant after arrest to the Fifth District Station, and thence to Central Headquarters.

On the following morning defendant was turned over to the federal authorities and promptly brought before the U. S. Commissioner at approximately 11:00 a. m. December 12, 1963 for arraignment on the instant charge.

### Search and Seizure.

The defendant first maintains that the District Court erred in overruling his motion to suppress the introduction into evidence of his overcoat, assertedly obtained by illegal search and seizure.

When the pursuing bank employees found the robber's getaway car, the keys were in the ignition and the overcoat in question was partly inside and partly outside the closed car door. FBI Agent Buckley was instructed to investigate the car and its contents. He arrived at the location of its abandonment approximately thirty minutes after the robbery. Agent Buckley, without a warrant, searched the car, removed the coat, and then transferred the car to a government garage within less than an hour after the bank was robbed and several hours before the defendant was apprehended and his identity confirmed by witnesses.

The constitutional rights against illegal search and seizure as guaranteed by the Fourth Amendment must be zealously protected. However, it sometimes poses a difficult problem to determine whether these individual rights have been infringed or whether under the circumstances, the police have conducted a fair and reasonable investigation within constitutional bounds.

Defendant premises his Fourth Amendment defense on McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L. Ed. 153 (1948) and Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964). In the McDonald case, unlike the search of a suspected robber's getaway car in the present case, the officers had been surveilling the defendant's movements and rooming house for two months. Without response to any emergency or other compelling reason for not obtaining a search warrant, they broke and entered illegally the defendant's living quarters. In the Preston case, an automobile was allegedly searched illegally without a warrant, but the search was not made until after the defendant had been arrested, taken into custody and the vehicle impounded. There was no danger that the vehicle or any evidence therein would be moved outside the jurisdiction when searched after the defendant's arrest. Hence, the search was held unreasonable as being too remote in time or place to be incident to the arrest and, therefore, illegal in the absence of a warrant. However, the Supreme Court observed that, "[W]hat may be an unreasonable search of a house may be reasonable in the case of a motor car." Preston v. United States, supra at 366–367, 84 S.Ct. at 883.

In the instant case the suspected robber was still at large at the time of the alleged illegal search and capable of removing his escape vehicle across the nearby state line outside the jurisdiction of local authorities. The federal agents removed the overcoat and had the car towed to a government garage for further investigation in order to facilitate identity and apprehension of the escaping felon.

Only those searches and seizures without a warrant that are deemed unreasonable fall within the Fourth Amendment's prohibition. Preston v. United States, supra. The expediency of the events following the crime justified the investigating officers' confiscation of the felon's clothing and car in order to swiftly determine his identity and thereby effectuate his capture before he could make good his escape or destroy other evidence of the crime.

Inasmuch as the coat was not discovered by a search nor taken by seizure in the legal sense of the terms, further reason exists for holding the Fourth Amendment inapplicable. Respectable authority holds that it is not a search within the meaning of the Fourth Amendment to observe in a public place that which is apparent for all the world to see. United States v. Lee, 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927); Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924); United States v. Williams, 314 F.2d 795 (6th Cir. 1963); Trujillo v. United States, 294 F.2d 583 (10th Cir. 1961); Petteway v. United States, 261 F.2d 53 (4th Cir. 1958). And because seizure connotes a forcible dispossession from the owner, not a voluntary surrender, it was held in Lee v. United States, 95 U.S.App.D.C. 156, 221 F.2d 29 (1954), that stolen jewelry wrapped in a napkin which the defendant dropped on the street was properly admitted into evidence. See also Vincent v. United States, 8th Cir. 337 F.2d 891 (1964), and Burton v. United States, 272 F.2d 473 (9th Cir. 1960), cert. denied 362 U.S. 951, 80 S.Ct. 863, 4 L.Ed. 2d 869 (1960).

■ Accordingly, we do not believe admission into evidence of the overcoat which was found abandoned in a public place was an abridgement of defendant's constitutional guarantees.

### Arrest and Detention.

Defendant next contends the District Court erred in overruling his motion to suppress the use of any statements made by him to government agents after his arrest because his was illegally taken into custody and held for an undue period of time before arraignment by a U. S. Commissioner.

Since the arrest was made without warrant, its legality must be tested by the standard of probable cause. We recently reviewed the leading authorities which have defined this standard in Schook v. United States, 337 F.2d 563, (8th Cir. 1964) and concluded:

"Reasonable grounds for suspicion when accompanied by facts or circumstances strong enough to justify a reasonably cautious man to believe the guilt of the suspect, suffice to constitute probable cause necessary for arrest without warrant. The Supreme Court in Carroll v. United States, 267 U.S. 132, 161, 45 S.Ct. 280, 288, 69 L.Ed. 543, 39 A.L.R. 790 (1925) said, 'The substance of all the definitions [of probable cause] is a reasonable ground for belief of guilt.' See also Ker v. California, 374 U.S. 23, 34–35, 83 S.Ct. 1623 [10 L.Ed.2d 726] (1963); Henry v. United States, supra [361 U.S. 98] at 102, 80 S.Ct. 168 [4 L.Ed.2d 134] citing cases; Draper v. United States, 358 U.S. 307, 313, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); and Mueller v. Powell, 203 F.2d 797, 800–801 (8th Cir. 1953)."

■ The arresting officer here knew that the bank had been robbed by a man identified from photographs as the defendant by several witnesses and that the license number of the automobile used by the robber was registered under the name and address of the defendant. This officer recognized the defendant from a photograph and arrested him when he returned to his home on the afternoon of the holdup. Such knowledge on the part of the arresting officer provided reasonable ground for belief in defendant's guilt so as to constitute probable cause for his arrest without a warrant.

### Lineup.

Shortly after defendant's arrival at Central Police Headquarters, the St. Louis police placed him alongside of several other prisoners in a "lineup." He was identified by three witnesses as the man they had seen either rob the bank or flee from the scene of the robbery.

■ Defendant first urges that the District Court erred in admitting this testimony of his identification as it occurred while he was illegally detained after his arrest at 3:00 p. m. on December 11 and before being arraigned by the U. S. Commissioner around 11:00

a. m. the following day. Since we have deemed the arrest legal, this period of detention was not unlawful per se nor unreasonable in duration as the case was still in the investigative stage and it was entirely proper for the police to permit witnesses to the crime to personally view the suspect they had previously identified from photographs as the robber.

 Defendant further asserts the lineup was improper because he was forced to incriminate himself in violation of his rights under the Fifth Amendment. The mere viewing of a suspect under arrest by eyewitnesses does not violate this constitutional privilege because the prisoner is not required to be an unwilling witness against himself. There is a distinction between bodily view and requiring an accused to testify against himself. See 8, Wigmore, Evidence § 2265, at 386 (McNaughton rev. 1961). In dealing with a similar question, Mr. Justice Holmes in Holt v. United States, 218 U.S. 245, 252–253, 31 S.Ct. 2, 6, 54 L.Ed. 1021 (1910) said:

"But the prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material. The objection in principle would forbid a jury to look at a prisoner and compare his features with a photograph in proof."

See also Barrett v. State, 190 Tenn. 366, 229 S.W.2d 516, 18 A.L.R.2d 789 (1950) and Annot., 18 A.L.R.2d 796 (1962).

Therefore, we do not believe the eyewitnesses' confirmation of defendant's identification from photographs as the bank robber through utilization of the "lineup" intruded upon his right against self-incrimination.

*Production of Statement Before Trial.*

Defendant next asserts error by the District Court in overruling his pretrial motion for production and inspection of a statement made by him to an FBI agent during custody.

 Shortly after his arrest an FBI agent asked the defendant if the coat and hat found near the scene of the abandoned escape car were his, to which the defendant replied affirmatively. The agent transcribed the defendant's answer in note form which the government was not required to produce in advance of trial. These notes were furnished defendant's counsel upon conclusion of the agent's direct testimony during trial for cross-examination purposes in accordance with the Jencks Act, 18 U.S.C.A. § 3500.

Nothing can be found in the common law, Rule 16 of the Federal Rules of Criminal Procedure, Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), or the Jencks Act, supra, which requires that such a statement be furnished in advance of trial.

In Shores v. United States, 174 F.2d 838 (8th Cir. 1949), this Court called attention to the fact that the common law recognized no right of discovery in criminal cases. This decision also exhaustively reviewed the history behind redaction of Rule 16, concluding it created no right in the defendant to demand a copy of his confession before trial.

Nor did Jencks v. United States, supra, hold that a statement had to be furnished defendant prior to trial. That case dealt with the error in denial by the trial judge that the government be required to produce certain reports for inspection and use in cross-examination of its witnesses. Its rationale prompted passage of the Jencks Act.

 We construed the breadth of that Act in Foster v. United States, 308 F.2d 751, 755 (8th Cir. 1962):

"Under 18 U.S.C.A. § 3500 the defendant is entitled, '*After a witness called by the United States has testified on direct examination,* * * *'* (emphasis supplied) to any written statement ' * * * signed or otherwise adopted or approved by him' which is in the pos-

session of the government and which relates to the subject matter as to which the witness has testified. The purpose is impeachment only. The Act is one of limitation. It circumscribes what may be obtained and the purpose for which it may be used."

Thus, in the absence of clear right, pretrial production of such a statement as here should remain within the sound discretion of the trial court. The Jencks Act does not afford the defendant a license to rummage through prosecution files to select defense materials in advance of the trial even before determination by the prosecution to use such documents or testimony contained therein as proof of its case against the defendant. Indeed, the Jencks Act was intended to protect the government files from such unwarranted disclosure and to only make available at trial those materials which might lead to impeachment. See Ogden v. United States, 303 F.2d 724 (9th Cir. 1962), cert. denied 376 U.S. 973, 84 S.Ct. 1137, 12 L.Ed.2d 86 (1964).

Under such an interpretation of the Jencks Act as approved by the Supreme Court in Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959), production of the agent's report prior to cross-examination constituted compliance.

### Admissibility and Sufficiency of the Evidence.

The defendant assigns as error the admission into evidence of the component parts of the non-explosive, simulated bomb used in the robbery which consisted of a brown paper bag, a small box, a short length of wire and an ordinary alarm clock. It is argued that these exhibits were irrelevant to proof of any element of the crime.

■ Title 18 U.S.C.A. § 2113, inter alia, makes it a crime to take money from another, which is in the custody of any bank, by "intimidation." The indictment charged the defendant with this offense. This real evidence of the "holdup weapon" demonstrated the method by which the crime of obtaining money from another through intimidation was executed. The relevancy of this evidence rests on the fact that it tended to connect the defendant with the crime. See 22A C.J.S. Criminal Law § 709 (1961) and 20 Am.Jur. Evidence § 718 (1962). Generally, devices and instruments used in the commission of crime are properly admitted into evidence. See e. g., Evans v. United States, 122 F.2d 461 (10th Cir. 1941), cert. granted 311 U.S. 635, 61 S.Ct. 69, 85 L.Ed. 404; rem'd. per curiam 312 U.S. 651, 61 S.Ct. 548, 85 L.Ed. 1102; cert. denied 314 U.S. 698, 62 S.Ct. 478, 86 L.Ed. 558 (1941), where the court admitted a string and broom used in the commission of a homicide.

■ The defendant also objected to introduction into evidence of his hat and overcoat on grounds of irrelevancy. The overcoat was found in the abandoned car used by the robber and the hat in a nearby alley. The defendant admitted ownership of both to an FBI agent. In addition, they were identified by several witnesses as similar to the clothing worn by the fleeing robber. These exhibits likewise were relevant in connecting the defendant with the crime. In Headen v. United States, 115 U.S.App.D.C. 81, 317 F.2d 145 (1963), it was held that articles found by officers on defendant's route of flight were properly admitted as they were sufficiently identified and linked to the defendant.

■ Defendant further objects to the relevancy of evidence which showed that the license application for registration of the abandoned car was in his name. The application for registration was not actually admitted into evidence, but testimony as to its contents was received from the custodian of these records. Had the former been the case, still no error would have been occasioned. See Ahlstedt v. United States, 315 F.2d 62 (5th Cir. 1963), cert. denied 375 U.S. 847, 84 S.Ct. 101, 11 L.Ed.2d 74 (1963). There is no dispute that the robber used the automobile in question to effect his getaway. The testimony regarding registration of this vehicle in defendant's

name was relevant insofar as it proved that the defendant was the record owner of the automobile used to commit the crime, a circumstance from which the jury could logically infer tended to establish defendant's guilt. Furthermore, the defendant admitted ownership of the automobile, and thus no possible prejudice could accrue from admission into evidence of this cumulative testimony indicating registration under his name.

█ The defendant challenges the sufficiency of the evidence as inadequate to send the case to the jury on the ground that there was no showing that his alibi was impeached or contradicted. The eyewitness account of the robbery and identification of the defendant by the bank teller as well as the positive identification by two other witnesses who saw the robber in his flight from the bank are certainly in contradiction to defendant's testimony of being at another place at the time of the commission of the crime. The jury simply chose not to credit his testimony. We believe its verdict of guilty was based on substantial direct, as well as strong circumstantial evidence, restatement of which would unnecessarily lengthen our opinion.

### Instructions.

In charging the jury, the District Court read the pertinent portions of the statute upon which the indictment was based in addition to reciting the indictment, explaining that:

> "In the indictment and in the statute the word 'intimidation' is used and as used in the statute and in the indictment 'intimidation' means being in fear and the fear must arise from the conduct of the defendant rather than the mere timidity of the victim."

The trial judge concluded by summarizing the theory of the case as presented by both the government and defendant.

█ From all of this, defendant asserts that the government's position was overemphasized in the eyes of the jury. If overemphasis occurred, it was the

riveting of the jury's mind to the absolute necessity of the government's proving intimidation and demonstrating beyond a reasonable doubt that it stemmed from defendant's actions. It is not error, but sometimes better practice, to read all or part of a criminal statute when instructing the jury. We observed in Williams v. United States, 328 F.2d 256, 262 (8th Cir. 1964), cert. denied 377 U.S. 969, 84 S.Ct. 1651, 12 L.Ed.2d 739 (1964):

> "A court may and generally should, where the law governing the case is expressed in a statute, employ the language of the statute in its instructions."

See also Smith v. United States, 106 U.S. App.D.C. 26, 269 F.2d 217 (1959), cert. denied 361 U.S. 865, 80 S.Ct. 130, 4 L. Ed.2d 108 (1959); Carney v. United States, 163 F.2d 784 (9th Cir. 1947), cert. denied 332 U.S. 824, 68 S.Ct. 165, 92 L. Ed. 400 (1947); Morris v. United States, 156 F.2d 525, 169 A.L.R. 305 (9th Cir. 1946).

In Morris v. United States, supra, the court said that a charge should not leave the jurors in ignorance of or leave to their conjecture what constituted the offense charged; and that where a charge is based upon a statute sufficiently clear the judge may set forth the statute in his instruction or otherwise he should explain it in such language that the jury would have a clear understanding of the law before applying it to the facts. Of course, the trial judge has a basic duty of fully and clearly instructing the jury, so the jury can understand the nature of the offense charged in order that it may intelligently perform its fact finding function.

█ The pertinent parts of the District Court's charge in the case at bar are not subject to an interpretation that would imply prejudice. The trial judge was being particularly careful that the jury understood the offense charged, as well as the burden upon the government to prove intimidation as an essential element for conviction.

The final assignment of error is based on the District Court's instruction to the jury that it was *bound* to consider the vital interest of the defendant in testing his credibility as a witness. The trial judge first told the jury that the defendant had a right to take the stand and his testimony was to be treated like the testimony of any other witness.

The propriety of explaining to the jury that it must weigh his testimony in light of his great interest in the outcome of the trial was established in Reagan v. United States, 157 U.S. 301, 311, 15 S. Ct. 610, 613, 39 L.Ed. 709 (1895). The Supreme Court ruled:

> "In the same manner, in behalf of the government, the court may charge the jury that the peculiar and deep interest which the defendant has in the result of the trial is a matter affecting his credibility, and to be carefully considered by them.

> "Tested by these rules, we see in the instruction objected to nothing of which complaint can reasonably be made. In the first part it lays down a general rule, applicable to all circumstances, and then in the latter part, simply calls attention to the fact that the defendant has a deep personal interest in the result of the suit, and that that should be considered by the jury. There is no declaration or intimation that the defendant has been untruthful in his testimony. There is only a reference to the jury of the matter of credibility, coupled with the declaration that interest in the result is a circumstance to be weighed in its determination. This, clearly, is unobjectionable."

In Foley v. United States, 290 F.2d 562, 569 (8th Cir. 1961), we approved a similar instruction to the one under attack here, which varied only in its omission of the term "bound." In that case, the instruction referred to the subject as "the very vital interest that defendant has in the outcome of this case."

In the later case of United States v. Sullivan, 329 F.2d 755, 757 (2nd Cir. 1964), cert. denied 377 U.S. 1005, 84 S. Ct. 1943, 12 L.Ed.2d 1054 (1964), citing both Reagan and Foley, it was stated, "An instruction may properly point out the defendant's special interest in a case."

 There is no intimation or inference from the District Court's charge that the defendant here had been untruthful in his testimony. The trial judge properly admonished the jury that in testing defendant's credibility, they were obliged to consider his vital interest in the outcome of the trial.

This Court expresses its appreciation to court-appointed counsel, Mr. Samuel H. Liberman, II, for the thorough and capable fashion in which he presented defendant's appeal.

The judgment of conviction is affirmed.